**GORDON SILVER**
MICHAEL N. FEDER
Nevada Bar No. 7332
Email:  mfeder@gordonsilver.com
JUSTIN J. BUSTOS
Nevada Bar No. 10320
Email: jbustos@gordonsilver.com
ANJALI D. WEBSTER
Nevada Bar No. 12515
Email: awebster@gordonsilver.com
100 W. Liberty Street, Suite 940
Reno, Nevada 89501
Tel:  (775) 343-7500
Fax: (775) 786-0103

**ULMER & BERNE LLP**
FRANCES FLORIANO GOINS (*Admitted Pro Hac Vice*)
Email:  fgoins@ulmer.com
1660 West 2nd Street, Suite 1100
Cleveland, OH 44113
Tel:  (216) 583-7202
Fax:  (216) 583-7203

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

### DISTRICT OF NEVADA

| | |
|---|---|
| CHINA ENERGY CORPORATION, a Nevada corporation, | CASE NO.  3:13-cv-00562-MMD-VPC |
| Plaintiff, | |
| vs. | |
| ALAN T. HILL, ELENA SAMMONS, MICHAEL SAMMONS, THOMAS S. VREDEVOOGD, TRUSTEE OF THE KIMBERLY J. VREDEVOOGD TRUST UA 1007/2008, JUN HE, and RANDY DOCK FLOYD, | |
| Defendants. | |

### PLAINTIFF CEC'S REPLY TO THIRD-PARTY DEFENDANT COR CLEARING, LLC'S OPPOSITION TO CEC'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT I OF THE COMPLAINT AS TO THE SAMMONS DEFENDANTS

PLAINTIFF CHINA ENERGY CORPORATION ("CEC"), by and through its attorneys at the law firms of GORDON SILVER and ULMER & BERNE LLP, hereby submits this Reply

1  in response to Third-Party Plaintiff COR Clearing, LLC's Opposition to Plaintiff China Energy's

2  Motion for Partial Summary Judgment on Count I as to the Sammons Defendants (Doc. 251) (the

3  "Opposition") and in further support of its Motion for Partial Summary Judgment on Count I as

4  to the Sammons Defendants (Doc. 71) (the "Motion").  This Reply is supported by the following

5  memorandum of points and authorities, Federal Rule of Civil Procedure 56, all pleadings and

6  papers on file herein, and any other materials this Court may choose to consider.

7                          **MEMORANDUM OF POINTS AND AUTHORITIES**

8                                          **INTRODUCTION**

9          Third-Party Defendant COR Clearing, LLC's ("COR") Opposition to Plaintiff China

10  Energy Corporation's ("CEC") Motion adds no new facts, furthers no new legal arguments, and

11  utterly fails to demonstrate a genuine issue as to any material fact that could preclude judgment

12  as a matter of law in favor of CEC and against Defendants Michael and Elena Sammons  (the

13  "Sammonses") on Count I of the Complaint.  Nonetheless, COR does its darnedest to confuse the

14  legal issues presented in this case and to obfuscate the relevant facts, all of which are undisputed.

15  Given the undisputed facts of this case, there is no question that the Sammonses have failed to

16  perfect their right to appraisal pursuant to NRS 92A.440.

17          In over twenty pages of misleading citations to inapplicable out-of-state cases and

18  misdirection regarding the facts of this case, COR's Opposition makes only three arguments, all

19  of which are meritless.

20      •   COR erroneously argues that Elena Sammons's shares were uncertificated merely

21          because she held them, as a beneficial owner, in street name.[1]  None of the cases

22          cited by COR supports that proposition and, indeed, that argument is directly

23          contradicted by the Nevada Supreme Court's decision in *Smith v. Kisorin USA,*

24          *Inc.*, 254 P.3d 636 (Nev. 2011).

---

[1] COR's brief addresses only the 650,000 shares held in Elena Sammons's trust account because it only handled the
dissent for those shares.  The remaining 350,000 shares held by both of the Sammonses were handled separately by
the Sammonses' broker, TD Ameritrade.  COR's brief is little more than an effort to avoid liability, given that it
failed to perfect the Sammonses' dissenters' rights.  Although this brief addresses Elena Sammons's 650,000 trust
account shares primarily, the arguments set forth herein, for the most part, apply with equal weight to the
Sammonses' separately held 350,000 shares.

- COR argues that the General Notice Package sent by CEC to all record stockholders did not "set a date" when all stockholders were required to comply with the provisions of NRS 92A.440 in order to properly assert dissenters rights. That argument, too, is erroneous because the General Notice Package expressly stated that all would-be dissenters had to comply with the requirements of NRS 92A.440 within 30 days of "delivery" of the notice.  As explained below, there is nothing vague or ambiguous about that instruction because Nevada law expressly provides that delivery is effective as of the date when a corporate notice is deposited "in the United States mail."  NRS 75.150(7)(b).

- COR argues, contrary to binding Nevada precedent, that Elena Sammons's failure to submit the stock certificate for the 650,000 shares held in her trust account prior to the 30-day deadline should be swept under the rug under the ruse of "substantial compliance."   Substantial compliance is not the law in Nevada, and COR's argument in that regard should be rejected.[2]

For the reasons explained below, as well as all of the reasons argued in CEC's Motion and its previous memoranda on this Motion and in opposition to the Sammonses' numerous previous motions, CEC is entitled to judgment as a matter of law on Count I of the Complaint that both Michael Sammons and Elena Sammons failed to perfect their rights to appraisal under Nevada law.

## FACTS AND PROCEDURAL HISTORY

The undisputed facts and much of the relevant procedural history in this case are set forth in full in CEC's Motion.  (See Doc. 71 at 2-5).   Since CEC filed its Motion ten months ago, however, the Sammonses have made numerous additional filings in which they made further admissions that demonstrate the Sammonses—and especially Elena Sammons—failed to properly assert their appraisal rights.[3]

---

[2] Notably, all of the arguments presented by COR have been previously argued by the Sammonses.  Thus, COR's brief adds nothing to the Court's analysis but extraneous spilled ink.

[3] As the Sammonses argued previously, it appears that the reason the Sammonses' stock certificates were late was

1   First, the Sammonses have admitted that CEC's stock transfer agent, Quicksilver Stock

2   Transfer, LLC, sent the General Notice Package[4] by regular U.S. mail to all stockholders of

3   record on July 11, 2013.   (*See* Doc. 229 at 6 (admitting that the General Notice Package was

4   mailed on July 11, 2013); *see also* 71-5 (Affidavit of Alan Shinderman) at 4 (swearing under

5   oath that the General Notice Package was mailed on July 11, 2013).  The mailing date of the

6   General Notice Package is therefore undisputed.

7   Second, the Sammonses have admitted that the ***latest date*** when Cede & Co., the record

8   stockholder for their shares, would have received the General Notice Package was July 16, 2013,

9   based on Cede & Co.'s own records that the Sammonses have obtained during this litigation.

10  (*See* Doc. 229 at 6 (citing to DTCC information sheet "created 07/16/2013" and arguing that that

11  document demonstrates that Cede & Co. received the General Notice Package on that date)).

12  While CEC submits, as previously argued, that the date of actual receipt by Cede & Co. is

13  irrelevant to determining the deadline for compliance in this case as a matter of law, as discussed

14  below, this fact is especially damning to COR's arguments on substantial compliance.

15  Third, the Sammonses have admitted that the certificate for the 650,000 shares of CEC

16  held in Elena Sammons's Trust Account was not deposited with CEC until at least August 26,

17  2014.   (*See* Doc. 229 at 9).    Fourth, and perhaps most importantly, the Sammonses have

18  admitted that COR's untimely submission of that certificate to CEC means that COR – and the

19  Sammonses – "failed to comply with the [General Notice Package] which required delivery [of

20  stock certificates] within 30 days of delivery . . . ."  (*Id.*)

21  COR's Opposition cites ***no contrary facts***.  Therefore, given all of these facts admitted by

22  the Sammonses and the other facts and admissions previously outlined in CEC's Motion, there is

23  no question that the Sammonses failed to perfect their right to a dissenters' appraisal and that

_____  (continued)

24  that COR and Cede & Co. failed to timely deliver the stock certificates to CEC's statutory agent despite having them
    in their possession with sufficient time to deliver them to CEC prior to the deadline.  *See* Doc. 229 (Sammonses'

25  Motion for Partial Summary Judgment Against COR) at 14 (explaining that COR failed to timely deliver the
    certificate for the 650,000 shares of CEC held in Elena Sammons's trust account despite having that certificate in its

26  possession on August 9, 2014).

27  [4] Capitalized terms, as used in this memorandum, unless otherwise noted, have the same meanings as those in CEC's
    Motion.

28

1  CEC is entitled to judgment as a matter of law on Count 1 of the Complaint against the
2  Sammonses.

3                                    **DISCUSSION**

4     **1.  The Sammonses CEC Shares Were Certificated as a Matter of Law, and the
          Sammonses' Failure to Timely Submit Stock Certificates for their Shares Means
5          That They Forfeited Their Dissenters' Right to Appraisal.**

6
7          The Sammonses have admitted, in numerous submissions to this Court, that (1)
8  certificates for their shares existed "prior to the deadline" for submitting them to CEC; (2) those
9  certificates were in COR's—or Cede & Co.'s—possession in advance of the deadline for
10 compliance set by the General Notice Package; and (3) those stock certificates were not
11 deposited with CEC prior to the August 12, 2013 deadline (*see* Doc. 71-4 (Declaration of Justin
12 Bustos) at ¶2 & Ex. A; *see also* Doc. 229 at 13-14). Despite these undisputed facts, COR
13 attempts to argue that the shares held in Elena Sammons's trust account were uncertificated to
14 excuse its duty to deposit the 650,000 share certificate to CEC on Elena's behalf prior to the
15 deadline mandated by the General Notice Package, pursuant to NRS 92A.440.

16         The sole basis for COR's argument is that Elena Sammons was the beneficial owner of
17 the 650,000 shares held in her trust account, not a record owner, and that fact, without more,
18 means that those shares were uncertificated.  (*See* COR Opposition at 7 (headline arguing that
19 Elena Sammons's shares "were uncertificated" because she was a "beneficial owner.").  COR's
20 position boils down to the argument that simply because Elena Sammons did not personally
21 possess physical stock certificates, her shares were uncertificated.  COR's over-simplification
22 purposely and erroneously equates the distinct legal concepts of holding stock in street name
23 with holding uncertificated shares. This totally unsupported argument betrays COR's
24 fundamental misunderstanding of the applicable law.

25         COR relies on *Apache Corp. v. Chevedden*, 696 F. Supp. 2d 723, 726 (S.D. Tex. 2010),
26 and *In re President Casinos, Inc.*, 502 B.R. 841, 844 (Bankr. E.D. Mo. 2013), to argue that all
27 shares held in street name at Cede & Co. – like the Sammonses shares in this case – are

28

uncertificated merely because Cede & Co. is the record owner, as opposed to the Sammonses holding physical share certificates.  Neither of those cases supports COR's position.  Instead, the cases simply say that the DTC as the record owner, through its nominee, Cede & Co. holds the stock certificates instead of the beneficial owner.

As explained by the *Apache Corporation* court, the DTC's "primary purpose is to improve trading efficiency by 'immobilizing' securities, or ***retaining possession of securities certificates even as they are traded***."  696 F. Supp. 2d at 726 (emphasis added); *see also President Casinos*, 502 B.R. at 844 ("DTC acts as a clearing house for publicly traded securities and ***maintains physical custody of certificated securities*** for its participants and the Beneficial Owners.") (emphasis added).  Furthermore, it is a fundamental principle of securities law that a security is "either a certificated or an uncertificated security," and, therefore, a security cannot be both certificated and uncertificated at the same time.   U.C.C. § 8-102; *see also* NRS 104.8102(1)(d) & (q).  The very purpose of holding shares in street name, as explained by the courts in *Apache Corporation* and *President Casinos*, is that the record owner will hold certificates, rather than the beneficial owners. As a matter of law, holding shares in street name does not render them uncertificated or permit beneficial stockholders in Nevada to avoid the obligation to deposit stock certificates with the corporation in order to perfect their dissenters rights pursuant to NRS 92A.440.

Moreover, under Nevada law, as CEC has previously explained, all shares of stock must be evidenced by certificates unless a resolution of the board of directors of the company provides otherwise, as a matter of Nevada corporation law.  *See* NRS 78.235(1) & (4).   In this case, CEC's Board of Directors has not authorized the issuance of uncertificated shares. (*See* Doc. 71-2 (Declaration of Wenxiang Ding) at ¶3-4).  As a matter Nevada law, CEC's shares were certificated at the time of the reverse stock split at issue in this case, whether they were held by individual record stockholders or in street name with Cede & Co.  That conclusion is fully in line with the Sammonses' own admission that certificates existed for their shares prior to the deadline for submitting them to CEC, and even with the documents submitted by COR in support of its

Opposition, which explain that the DTC understood that "the issuance of the [new] certificate is part of the dissenters process."   (Doc. 251-1 at 6).   Thus, Elena Sammons's shares were certificated as a matter of Nevada law, and all parties involved, including the DTC, COR, and CEC, understood that a separate stock certificate needed to be issued so that she—or her broker—could deposit it with CEC in order to perfect her dissenters' rights.[5]

The *Smith v. Kisorin* case, contrary to COR's interpretation of it, plainly illustrates that (in accordance with the clear language of the Nevada statute, NRS 92A.44(1)(c)), in a case where shares are held in Cede & Co's name, the beneficial owners are required ***both*** to demand payment and deposit their certificates with the corporation in order to perfect their rights.   In *Smith*, the court affirmed judgment in favor of the corporation, holding that the stockholders had failed to perfect their dissenters rights on two separate bases, one of which was that the stockholders failed to timely submit their dissent. *See* 254 P.3d at 641 & n3.   Critically, the *Smith* court also upheld summary judgment against the Smiths on the grounds that it did "not appear from the record that the Smiths attached the stock certificates *or* Cede & Co's written consent, ***as was required by the dissenters' rights notice and Nevada law***." *Id.* (emphasis added).   That is, the beneficial owners failed to perfect their dissenters rights because they "and the owner in street name, Cede & Co., failed to submit a sufficient demand for payment ***with the stock certificates attached***." *Id.*  (emphasis added).

The *Smith* case clearly stands for the proposition that (in conformance with the Nevada statute) a timely demand for payment ***and*** the deposit of stock certificates were required for the beneficial stockholders in that case to perfect their dissenters' rights.   COR's argument – that because the *Smith* decision states that the beneficial stockholders failed to meet either of those requirements somehow means that the beneficial owners could have perfected their rights by meeting just one of them – is a misleading, and obviously wrong, reading of *Smith*.

---

[5] As the *Apache Corporation* and *President Casinos* courts explained, Cede & Co. holds certificated securities in its name for numerous beneficial owners.  When one of those beneficial owners decides to dissent from a corporate action, Cede & Co. requests a new, separate stock certificate for the block of shares that has chosen to dissent.  That is why obtaining a new stock certificate is a part of the dissenters process.

Under the *Smith* case, NRS 78.235(1) & (4), and the very cases upon which COR relies—*Apache Corporation* and *President Casinos*—the shares held in Elena Sammons's trust account were certificated shares and it was incumbent upon her, or COR as her broker, to deposit her stock certificates on or before the deadline set in the General Notice Package.  Because they failed to do so, as the Sammonses have admitted and as CEC has previously proven,  they forfeited Elena Sammons's right to appraisal under NRS 92A.440.

**2.   The General Notice Package Plainly Set a Date for Compliance.**

COR next argues that CEC's General Notice Package was defective, claiming that the language of its General Notice Package did not clearly set a date for compliance.   COR is, again, wrong.

CEC's General Notice Package instructed would-be dissenters that in order to perfect their dissenters' rights, they needed to complete all of the steps within 30 days of delivery of the Package.  Specifically, the General Notice Package stated:

> [Y]ou must take the following actions *within 30 days of the date that this Notice is delivered*: (i) deliver the completed Demand Letter; (ii) certify whether you acquired beneficial ownership of the shares before the date set forth in the Demand Letter; and (iii) deliver the certificates representing the dissenting shares to the Company.

(Doc. 71-5 (Affidavit of Alan Shinderman) at ¶¶3-4; *id.* Ex. A at page 11 of 33) (emphasis added).  Thus, the General Notice Package clearly set forth a date for compliance – dissenters had to comply within thirty days from delivery of the package.  There is nothing ambiguous about this phrasing.

Under NRS 75.150(7)(b), a corporation "delivers" something to a stockholder when it is placed in the mail:  "any notice or other communication . . . is effective . . . [i]f mailed by United States mail postage prepaid and correctly addressed to a stockholder . . . *upon deposit in the United States mail*."  (emphasis added).[6]    Thus, the date on which CEC's General Notice

---

[6] Thus, a dissenters' rights notice is "delivered" upon deposit in the United States mail. There is nothing in Title 7 or Chapter 92A to the contrary, and Nevada courts "interpret provisions within a common statutory scheme harmoniously with one another in accordance with the general purpose of those statutes."  *S. Nevada Homebuilders Ass'n v. Clark Cnty.*, 117 P.3d 171, 173 (Nev. 2005).

Package was "delivered" for purposes of NRS Chapter 92A was the date the package was deposited in the mail by or on behalf of CEC.[7]    CEC has submitted sworn testimony demonstrating that the General Notice Package was deposited in the mail on July 11, 2013. COR, for its part, has submitted **no evidence** to the contrary, and the Sammonses, as they must in the face of Mr. Shinderman's affidavit, have **admitted** this fact.  (*See* Doc. 229 at 6).    Thus, under Nevada law, the General Notice Package was delivered on July 11, 2013 and the clock started ticking that day, rendering the deadline no later than August 12, 2013.[8]

Furthermore, the fact that the General Notice Package set a date for compliance based on statutory "delivery" should be wholly unsurprising, given that it was sent with the understanding that litigation might ensue.  It is universal in litigation that response dates for motions, discovery, and, indeed, everything, are derived from the date that those principal filings are served.  *See*, *e.g.*, D. Nev. Loc. Civ. R. 7-2(b) (providing that an opposition to any motion is due "fourteen (14) days after service of the motion").  That rule sets a date certain for responding to a motion, even though it does not contain a specific date, based on the "service" of the motion, relying on the definition of "service" under the civil rules.  Similarly, the General Notice Package set the date for compliance at thirty days from delivery of the package, and delivery, in this context, is

[7] COR argues that the fact that the General Notice Package was not stamped with a date at the top means that no one could determine what the date of delivery was.  That argument, however, contradicts common sense.  It is undisputed in that CEC sent the package, though its stock transfer agent, by regular U.S. mail.  That being the case, the General Notice Package, when it arrived at Cede & Co., necessarily bore a postmark that would have dispelled the purported mystery as to when the package was placed in the mail and thus "delivered" as a matter of law per NRS 75.150(7)(b).

[8] COR claims, based on one of its internal emails, that it believed that the deadline was September 30, 2013, saying that its employee talked with CEC's transfer agent who allegedly "confirmed" that the deadline was September 30, 2013.  (*See* Doc 251-1 at 5 of 16).  That email is nothing more than hearsay within hearsay and cannot be considered by the Court.  Even if it were considered, however, COR could not reasonably have believed that the deadline was September 30th, given that the email in question is dated August 9, 2013 and everyone agrees that the General Notice Package expressly stated that the deadline for compliance was 30 days from delivery.  Even if it was delivered to Cede & Co that day (which, obviously, it was not), the deadline would have been well before September 30th.   In addition, to the extent that COR actually contacted CEC's transfer agent and "confirmed" that some deadline for compliance was September 30, 2013, COR possibly asked the wrong question.  The General Notice Package provides that September 30, 2013 was the deadline for stockholders holding more than 12,000,000 shares to exchange their old certificates for new ones or for stockholders holding less than 12,000,000 shares to submit certificates and receive cash payment.  (Doc. 71-5 (Affidavit of Alan Shinderman) at ¶¶3-4; *id.* Ex. A at page 5 of 33).  Thus, it appears that, if COR believed that September 30, 2013 was the deadline, it simply made yet another error in attempting to process Dr. Sammons's dissenter's demand.

1    legally defined by NRS 75.150(7)(b).

2         Finally, COR seems to argue that if the General Notice Package was ambiguous as it

3    claims, then CEC could not demand compliance by any date, leaving would-be dissenters to

4    comply by whatever date they wished.  That argument is obviously wrong.[9]  Even if the General

5    Notice Package were deemed to be ambiguous in this regard, the Court would ask what

6    "delivered" means as used in the package and construe it accordingly.  It could not erase entirely

7    the requirement that dissenters assert at timely demand.  And, as the Sammonses have previously

8    argued at length in several briefs, the Court would determine that delivery either means

9    deposited in the mail, as it does as a matter of law under NRS 75.150(7)(b), or it has some more

10   colloquial meaning, such as actual receipt.

11        Even defining delivery as actual receipt cannot help COR here, however.   As the

12   Sammonses have demonstrated using Cede & Co.'s own records, Cede & Co. received the

13   General Notice Package *no later than* July 16, 2013 and probably before then. (*See* Doc. 229 at

14   6 (citing to DTCC information sheet "created 07/16/2013" and arguing that that document

15   demonstrates that Cede & Co. received the General Notice Package on that date)).  Even if that

16   were the date when the clock started running (which, as a matter of law, it is not), then the

17   deadline for compliance would have been no later than August 15, 2014.  (*See id.*).   COR,

18   having waited *until August 23, 2013* to send the stock certificate for Elena Sammons's 650,000

19   shares, plainly failed to meet even that incorrect deadline.[10]

20        Thus, CEC's General Notice Package set a date certain for compliance within which

21   would-be dissenters were required to comply with NRS 92A.440, and COR's arguments to the

22   _____

23   [9] Indeed, while COR argues that "substantial compliance" with the statute is sufficient for stockholders, it seems to argue that strict compliance is required of the corporation.  COR cannot have it both ways, especially because in Nevada, the dissenters' rights statute is interpreted in favor of the corporation.  *See Smith*, 254 P.3d at 637 (explaining that, even assuming that the statute was ambiguous about whether beneficial stockholders are entitled to receive dissenters' rights notices, only record stockholders were entitled to them because any other construction "would place unfeasible requirements on corporations.").

25   [10] Additionally, the demand letter and stock certificate received by CEC regarding Dr. Sammons' 650,000 shares were submitted on Dr. Sammons' behalf in her personal capacity, despite the fact that those shares were actually held in Dr. Sammons' Rollover IRA by Delaware Charter Guarantee Trust as trustee.  (Compl. ¶4, Sammons Ans. ¶2) As previously explained by CEC, this, too, was in error and was subsequently corrected by COR well after the deadline.

28

1    contrary are unavailing.

2       **3.   The Doctrine of Substantial Compliance Does Not Apply Here.**

3          COR's third and final argument is that its failure to deposit Elena Sammons's stock

4    certificate prior to the deadline should be excused because she—and COR—substantially

5    complied with the requirements of the statute.  As CEC has previously argued in opposition to

6    the Sammonses' same pleas, substantial compliance finds no support in Nevada law.

7          COR's argument for substantial compliance is based almost entirely on inapplicable out-

8    of-state case law interpreting different dissenters' rights statutes.  For example, COR cites cases

9    from Delaware, West Virginia, Massachusetts, and other states, none of which has the same

10   dissenters' rights statute as Nevada.  COR bases its claim that "substantial compliance" is the

11   law in Nevada only on these non-controlling cases.  While COR argues that the Nevada Supreme

12   Court court was open to the idea of waiving the deadline for compliance in *Smith*, the Court

13   actually *rejected* the would-be dissenters demands on three independent grounds, thereby

14   demonstrating that dissenters must strictly comply with all of the requirements of the statute.  *See*

15   254 P.3d at 641 & n.3 (affirming summary judgment in favor of corporation because the

16   dissenters' demands were late, because they failed to submit certificates, and because their

17   demands were deficient).

18          The *Smith* Court's three-fold refusal to permit the dissenters' appraisal to proceed cannot

19   be interpreted as a judicial nod to the doctrine of substantial compliance.  Indeed, as COR's

20   Opposition notes, the *Smith* case makes no mention at all of substantial compliance – because it

21   simply is not Nevada law.  Despite this, COR cites to *Steiner Corp. v. Benninghoff*, 5 F.Supp.2d

22   1117, 1123 (D. Nev. 1998), apparently arguing that a few lines of *dicta* in a federal case where

23   compliance was not challenged in any way evidence that Nevada law favors substantial

24   compliance.  That bit of *obiter dictum* cannot overcome the Nevada Supreme Court's refusal to

25   waive any of the requirements of dissenters' rights statute in *Smith*, and it does not establish that

26   Nevada law favors substantial compliance.[11]

---

27   [11] Even assuming for the sake of argument that substantial compliance might apply in Nevada, it would not apply to
28   COR's failure to submit Elena Sammons's stock certificate on time.  As the Sammonses have admitted, this "is

1    **4.   <u>The Sammonses' Demand in Chinese Currency was Ineffective.</u>**

2          Finally, although COR's Opposition argues on and on that all that Elena Sammons had to

3    do was submit a demand for payment, which it claims she did do prior to August 12, 2013

4    deadline, COR ignores completely the fact that both of the Sammonses made their demands for

5    payment in Chinese currency, rather than U.S. dollars, a separate deficiency also fatal to their

6    demand.

7          As CEC has previously argued, (*see* Doc. 94), the Sammonses' demand in Chinese

8    currency did not comport with Nevada law.  There is nothing in NRS Chapter 92A or anywhere

9    in Title 7 of the Nevada Revised Statutes that would permit a would-be dissenter to state a

10   demand for payment in a foreign currency.  The Sammonses, for their part, have never cited any

11   applicable authorities to demonstrate that their demand was correct and instead relied on a

12   decision from an Australian state court, *Daewoo Australia Pty Ltd v. Subcorp Metway Ltd.*, 28

13   N.S.W.L.R. 692 (Sup. Ct. New S. Wales 2000), and certain non-applicable provisions of the

14   Nevada Foreign Money Claims Act, *e.g.*, NRS 17.590.  None of these authorities bears any

15   relevance to this issue.  COR, for its part, has not addressed this issue at all.

16         Most fundamentally, logic dictates that the Sammonses could only demand U.S. dollars

17   as payment for their shares in CEC.  CEC is a Nevada domestic corporation whose shares have

18   always been valued exclusively in dollars and traded on U.S. markets at prices quoted in dollars.

19   Further, the offer of payment to the Sammonses in connection with the Reverse Stock Split was

20   stated in dollars, and it was non-responsive for the Sammonses to state a demand in Chinese

21   RMB, given the fact that the exchange rates for currencies change daily.  Indeed, if a demand in

22   a foreign currency like RMB would be sufficient, then stockholders should be free to make a

23   demand in Lira or Shekels, or Bangladeshi Takas, or baskets of wheat or barrels of crude oil, or

24   ———————————————— (continued)

25   simply not a case where the principles of substantial compliance can come to the rescue" because COR, "without
     cause or excusable neglect (or any excuse whatsoever), simply sat on the certificate for two weeks until it finally
     delivered" it not to CEC, but to CEC's stock transfer agent, Quicksilver.  (*See* Doc. 229 at 14).  Even if not too late,

26   this delivery to the stock transfer agent was insufficient because the General Notice Package plainly required that the
     certificates were to be sent to CEC c/o CEC's statutory agent, United Corporate Services.  (*See* Doc. 71-5 (Affidavit

27   of Alan Shinderman) at ¶¶3-4; *id.* Ex. A at page 33 of 33).  Indeed, every other stockholder that submitted a stock
     certificate sent it to CEC c/o United Corporate Services.

28

shares in mortgage backed securities.  Indeed, all of those have established trading markets on which conversion rates could be established. But, certainly, the drafters of the Nevada dissenters' rights statute did not intend for courts to engage not only in a valuation of the shares, but also in a valuation of the dissenters' demand.  Indeed, the Sammonses' demand in RMB did not even properly put CEC on notice of the value that the Sammonses were seeking.

Additionally, as CEC has noted previously, only certain enterprises in designated pilot areas of the People's Republic of China are permitted to use Renminbe (*i.e.*, "RMB") to settle import/export trade transactions. In other words, generally business enterprises in China are not allowed to use RMB to conduct cross-border transactions, subject to certain limited exceptions, none of which apply in this case.[12]  Indeed, neither CEC nor any of its affiliated or controlled entities is on the list of enterprises allowed to use RMB to settle cross-border trade transactions. It would not be permissible under current Chinese law and regulations for CEC, a Nevada corporation, to make direct redemption payments to its dissenting stockholders in RMB.

On this basis, if the Court determines that Elena Sammons somehow met the deadline to comply with NRS 92A.440, despite the fact that her stock certificate arrived after any conceivable deadline based on the "delivery" of the General Notice Package, the Court should still find that Dr. Sammons failed to property dissent because she made a non-responsive demand in a foreign currency.

---

[12] *See* Kua Jing Mao Yi Ren Min Bi Jie Suan Shi Dian Guan Li Ban Fa Shi Shi Xi Ze (跨境贸易人民币结算试点管理办法实施细则) Regulations for Implementing the Administrative Rules on Pilot Program of Renminbi Settlement of Cross-border Trade Transactions (promulgated by The People's Bank of China, July 3, 2009, effective July 3, 2009) *available at* http://www.pbc.gov.cn/publish/english/964/2009/20091229135957041146521/20091229135957041146521_.html

1

<u>**CONCLUSION**</u>

2    Based on the undisputed facts as described herein and under applicable law, the Court

3 should grant summary judgment in favor of CEC and against the Sammonses on Count I of the

4 Complaint, declaring that the Sammonses forfeited their rights to appraisal by operation of NRS

5 92A.440(5), and therefore are not entitled to appraisal with regard to their shares.

6

7    DATED this 5th day of September, 2014.

8                    **GORDON SILVER**

9                    */s/ Frances F. Goins*
                     MICHAEL N. FEDER
10                   Nevada Bar No. 7332
                     JUSTIN J. BUSTOS
11                   Nevada Bar No. 10320
                     ANJALI D. WEBSTER
12                   Nevada Bar No. 12515
                     100 W. Liberty Street, Suite 940
13                   Reno, Nevada 89501

14                   **ULMER & BERNE LLP**
                     FRANCES FLORIANO GOINS
15                   *(Admitted Pro Hac Vice)*
                     1660 West 2nd Street, Suite 1100
16                   Cleveland, OH 44113
                     *Attorneys for Plaintiff*

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

The undersigned, an employee of Ulmer & Berne LLP, hereby certifies that he served a copy of **PLAINTIFF CEC'S REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT I OF THE COMPLAINT AS TO THE SAMMONS DEFENDANTS** via CM/ECF on September 5, 2014, to the following individuals:

Michael Sammons
15706 Seekers St
San Antonio, TX 78255
*Defendant in Proper Person*

Elena Sammons
15706 Seekers St
San Antonio, TX 78255
*Defendant in Proper Person*

Edmund J. Gorman, Jr., Esq.
ATTORNEY AT LAW, LTD.
335 W. First Street
Reno, NV 89503
*Attorney for Defendant Alan T. Hill*

Richard L. Elmore, Esq.
Holland & Hart
5441 Kietzke Lane, 2nd Floor
Reno, NV 89511
*Attorney for Thomas S. Vredevoogd, Trustee of the Kimberly J. Vredevoogd Trust UA 1007/2008*

**And by U.S. Mail**, postage prepaid, to the following individuals:

Jun He
231 Split Rock Rd
The Woodlands, TX 77381
*Defendant in Proper Person*

Randy Dock Floyd
4000 Goff Road
Aynor, SC 29551
*Defendant in Proper Person*

*/s/ Matthew T. Wholey*
An employee of ULMER & BERNE LLP

2109351v1